**ADAM J. BREEDEN, ESQ.**
Nevada Bar No. 008768
**BREEDEN & ASSOCIATES, PLLC**
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DEREK MYERS, on behalf of himself and all others similarly situated, | |
| Plaintiff, | CASE NO. 2:25-cv-00562-GMN-DJA |
| v. | |
| CITY OF LAS VEGAS, a political subdivision of the state of Nevada; JASON BROOKS, individually; SERGIO GUZMAN, individually; and JASON POTTS, individually, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | |

Plaintiff Derek Myers, individually and on behalf of all others similarly situated, by and through his counsel, Adam J. Breeden, Esq. of Breeden & Associates, PLLC, submits this opposition to *Defendants' Motion to Dismiss* (ECF No. 11) the *First Amended Complaint* (FAC, ECF No. 5) pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, the *Motion to Dismiss* should be denied.

## I. INTRODUCTION

Plaintiff Myers has filed a putative class action complaint based on a simple premise, i.e., that the City of Las Vegas marshals are routinely and knowingly conducting law enforcement outside the territorial scope of their limited jurisdiction, in violation of the law. Instead of filing an Answer to the First Amended Complaint and allowing full discovery into these important issues, the Defendants have filed a suspect Motion to Dismiss, lest the information obtained through formal discovery make the case any worse for the City Marshal's office than it already is. However, the

1    Plaintiff's allegations must be accepted as true at this pleading stage, *Ashcroft v. Iqbal*, 556 U.S.

2    662, 678 (2009), and this case should proceed on its merits.

3    ## II.    LEGAL STANDARD

4        A motion filed under FRCP 12(b)(6) motion tests whether a complaint states a plausible

5    claim for relief. *Iqbal*, 556 U.S. at 678. The Court must accept all well-pled factual allegations as

6    true, ignoring Defendants' self-serving legal conclusions. *Id.* at 678-79. Dismissal is warranted only

7    if the complaint fails to allege facts that, if true, entitle Plaintiff to relief. *Bell Atl. Corp. v. Twombly*,

8    550 U.S. 544, 555 (2007). The Court cannot impose a summary judgment level of proof to this

9    Motion as no formal discovery has occurred.

10    ## III.    ARGUMENT

11        Thus far even without formal discovery in this case the Plaintiff has uncovered (1) a prior

12    Nevada Supreme Court brief where the City admitted to the limited territorial jurisdiction of the

13    City marshals, (2) an admission as to limited territorial jurisdiction from the General Counsel of the

14    marshal's union, and (3) clear remarks in legislative history as to limited territorial jurisdiction, and

15    an admission by the Chief during an interview. After the filing of this Complaint, the City Marshals

16    have gone into full panic mode. On information and belief, the City Marshals (4) quickly but

17    unsuccessfully tried to get their jurisdiction increased by statute in a rushed bill in the Nevada

18    legislature that was defeated, Nev. SB 449 (2025), and (5) tried to get deputized by federal law

19    enforcement which was also rejected. Plaintiff has also (6) located at least two traffic stops

20    conducted by the *Las Vegas* City Marshals in the *city of Henderson*, Nevada, and (7) the American

21    Civil Liberties Union (ACLU) of Nevada has filed another lawsuit pending in this District raising

22    nearly identical claims, *Covington v. City of Las Vegas*, 2:25-cv-00737-JAD-BNW. In short, this

23    case raises serious claims as to abuse of law enforcement through the Las Vegas City marshals office

24    and should not be dismissed.

25    ### A. Plaintiff Plausibly Alleges That Defendants Defied Nevada's Clear
     ### Jurisdictional Limits.

26
     Defendants' assertion that City marshals had lawful authority to stop and arrest Plaintiff on

27    I-11/US Route 95 is not only incorrect—it is a direct affront to the limits established under Nevada

28

2

law. The First Amended Complaint ("FAC") alleges that this highway is not owned, leased, or otherwise under the control of the City of Las Vegas, which is dispositive. Under Nevada law, the authority of City marshals is explicitly limited to certain territory. NRS § 280.125(3)(b) provides that the jurisdiction of City marshals is limited to:

> "The enforcement of state laws and city and county ordinances **on real property owned, leased or otherwise under the control of the participating political subdivision.**" (emphasis added)

This limitation is mirrored in the Las Vegas Municipal Code (essentially the enabling ordinance for the City Marshals), which likewise states:

> "The authority and jurisdiction of the City Marshal is limited to: … [t]he enforcement of State laws and City and County ordinances **on real property owned, leased or otherwise under the control of the City of Las Vegas**." (emphasis added)

Defendants' extraterritorial traffic enforcement on a U.S. highway far outside city property cannot be squared with either source of legal authority. The statute's text is plain. City Marshals are a limited jurisdiction agency whose duties are necessarily limited to the protection of City property, for example, patrol of City parks, security at City buildings, and staffing of the City jail. Faced with these clear territorial limits, the Defendants instead resort to NRS § 171.124, a general statute that permits any "peace officer" to arrest without a warrant for an offense committed in the officer's presence. However, this is a textbook example of a general provision that cannot override a more specific, conflicting statute. As the Nevada Supreme Court has held: "When the specific statute conflicts with a general statute, the specific statute will take precedence." *S. Nev.. Homebuilders Ass'n v. Clark Cnty.*, 121 Nev. 446, 449, 117 P.3d 171, 173 (2005). NRS § 280.125(3)(b) is such a specific limitation—tailored exclusively to marshals. By contrast, NRS § 171.124 addresses general arrest powers applicable to all peace officers. However, when the City Marshals are involved, the specific territorial jurisdictional limit must control.

Defendants also invoke NRS § 171.17751, which authorizes certain officers to prepare and serve citations. But this statute only governs *how* citations may be issued—not *where* they may be issued. It does not displace the territorial boundary set forth in NRS § 280.125(3)(b). Accepting Defendants' interpretation would nullify the statute's jurisdictional language and render it

1   meaningless—a result the courts cannot and should not countenance.

2       Nor can Defendants circumvent these limits by claiming that marshals are "Category I"

3   peace officers under NRS § 289.460. That classification governs *training and certification*

4   standards—not territorial jurisdiction of marshals. Nothing in NRS Chapter 289 confers territorial

5   authority to any officer; instead, that is left to the domain of Chapter 280. Indeed, NRS § 289.150(2)

6   merely confirms that City Marshals are among those who *may* be vested with peace officer powers.

7   It does not grant those powers unconditionally or define their territorial reach at all. The suggestion

8   that Category I (training) status creates statewide (territorial) enforcement authority is not only

9   unsupported—it is fundamentally at odds with the entire framework of the law. If marshals could

10  enforce laws and make arrests anywhere in the state simply by virtue of their training certification,

11  the territorial limits in NRS § 280.125(3)(b) and LVMC § 2.28.080 would be nullities. They are not.

12  The Nevada Legislature explicitly imposed geographic restrictions on marshals to prevent exactly

13  this kind of roving, untethered enforcement authority.

14      Indeed, the Court must keep in mind the history of these territorial limits as well. In the early

15  1970s, in order to more efficiently serve the citizens of Clark County, Nevada and to eliminate

16  redundancy and administrative costs in law enforcement, the City of Las Vegas Police Department

17  and the Clark County Sheriff's Officer merged under a new state law permitting the formation of

18  the Las Vegas Metropolitan Police Department. This effectively ended the City of Las Vegas police

19  department and the City of Las Vegas' operation of a general law enforcement agency throughout

20  the city limits. It was only in 1993 that a state law was enacted to allow the City of Las Vegas to

21  maintain what became known as the City Marshal's office, a branch of law enforcement with limited

22  subject matter and limited territorial jurisdiction. As originally adopted, NRS § 280.125(3) was

23  meant to allow the creation of a city marshal's unit but severely restrict their authority. The clear

24  original intent of NRS § 280.125(3)(b) was to limit the territorial jurisdiction of City Marshals to

25  "enforcement of state laws and city and county ordinances on real property owned, leased or

26  otherwise under the control of the participating political subdivision." As contemplated and enacted,

27  the city marshals were clearly meant to have jurisdiction only in city-owned, leased, or directly

28

4

1    controlled property such as city parks, buildings, jails, and other spaces.

2        The Court need not adopt Plaintiff's reading of these statutes to reject the Defendants'

3    interpretation—it need only apply the statutes as written. Defendants' proposed interpretation not

4    only ignores the plain language of controlling law but also contradicts the City's own prior

5    acknowledgments and historical enforcement practice. The FAC plausibly alleges that marshals

6    arrested Plaintiff in a location beyond their territorial authority, in violation of both statutory law

7    and the Fourth Amendment. This Court should hold, consistent with governing statutory law and

8    basic interpretive canons, that Defendants' actions were unauthorized and unconstitutional.

9
        **B. Plaintiff Has Stated a Plausible Fourth Amendment Claim Because the
        Arrest Was Conducted Without Lawful Authority and Violated Clearly
10       Established Constitutional Limits.**

11       Defendants argue that Plaintiff's Fourth Amendment claim fails because the arrest was

12    supported by probable cause and conducted in their presence. They rely on *Atwater v. City of Lago*

13    *Vista*, 532 U.S. 318 (2001), and *Virginia v. Moore*, 553 U.S. 164 (2008), to claim that an arrest for

14    a misdemeanor traffic offense—even one conducted in violation of state law—is nonetheless

15    reasonable under the Fourth Amendment. But this misstates Plaintiff's core claim and overlooks

16    binding distinctions in the law, particularly misinterpreting *Virginia v. Moore*.

17       The issue here is not whether City marshals observed a traffic infraction in their presence. It

18    is whether they had legal authority to enforce any law in that location. The territorial jurisdiction of

19    Las Vegas City marshals is expressly limited to "real property owned, leased, or otherwise under

20    the control of the [City]." *See Nev. Rev. Stat.* § 280.125(3)(b). The Las Vegas Municipal Code

21    mirrors this restriction, limiting marshals to enforcing laws "on real property owned, leased, or

22    otherwise under the control of the City of Las Vegas." *Las Vegas, Nev., Mun. Code* § 2.28.080(B)

23    (2023). Defendants do not and cannot dispute that I-11/US Route 95 is not City property.

24    Accordingly, they lacked jurisdictional authority to initiate the stop or arrest Myers.

25       Defendants' reliance on NRS § 171.124 and generalized peace officer status under NRS §

26    289.460 is misplaced. Nevada law does not grant marshals statewide authority merely because they

27    are certified as Category I peace officers. *Moore* and *Atwater* do not hold otherwise. In *Moore*, the

28    Supreme Court permitted a warrantless arrest for a misdemeanor committed in the officer's presence

1   even when state law called for a citation, because the officer had jurisdiction to act under state law

2   and was executing a valid arrest under the Fourth Amendment. *See* 553 U.S. at 176. But here, Myers

3   alleges that the City marshals were not lawful actors under Nevada law in this context. They were

4   operating outside their permitted jurisdiction, not merely in violation of a procedural arrest rule.

5   That distinction is controlling.

6   While it is true that under *Virginia v. Moore*, 553 U.S. 164 (2008), the Fourth Amendment

7   does not encompass every state law procedural requirement, it surely bars extraterritorial arrests as

8   unreasonable. The 10th Circuit Court of Appeals has expressly held this. *Ross v. Neff*, 905 F.2d 1349,

9   1353-1354 (10th Cir. 1990) ("We have implied that an arrest made outside of the arresting officer's

10  jurisdiction violates the Fourth Amendment to the Constitution and is therefore actionable pursuant

11  to 42 U.S.C. § 1983 under the appropriate circumstances…We now so hold expressly."). *See United*

12  *States v. Henderson*, 906 F.3d 1109, 1117 (9th Cir. 2018) (magistrate judge's issuance of warrant to

13  be executed outside the geographic bounds of the judge's district violated the Fourth Amendment).

14  This is because the Fourth Amendment's "reasonableness" requirement is determined by the

15  common law at the time of the adoption of the Fourth Amendment. The common law of the founding

16  era often deemed searches and seizures unreasonable when police officers acted outside the bounds

17  of their jurisdiction. When the Fourth Amendment was adopted, the common law drew clear

18  distinctions based on whether an officer was acting within or outside the scope of his authority.

19  When attempting to execute a warrant, for example, an officer could execute the warrant only "so

20  far as the jurisdiction of the magistrate and himself extends." *Henderson*, 906 F.3d at 1116 (quoting

21  4 William Blackstone, Commentaries). Furthermore, "[a]t common law, an officer [could not] arrest

22  a person outside of his precinct, even though the offense was committed within it." 2 David S.

23  Garland & Licius P. McGehee, The American and English Encyclopaedia of Law 863 (2d ed. 1896).

24  The Constitution itself provides support for the principle that police officers' legitimate power was

25  limited under the common law by the territorial limits of their jurisdiction. The Extradition Clause

26  requires states to comply with requests made by other states to extradite accused felons. U.S. Const.

27  art. IV, § 2, cl. 2; *see also Puerto Rico v. Branstad*, 483 U.S. 219, 226, 107 S. Ct. 2802, 97 L. Ed.

28  2d 187 (1987); *Engleman v. Murray*, 546 F.3d 944, 949 (8th Cir. 2008) ("Under a historical

1    understanding of the Fourth Amendment, the jurisdiction of the issuing judge and the executing

2    officer is limited, and a warrant is not valid if an officer acts outside of that limited jurisdiction.").

3            Reasonable suspicion or probable cause is not a hall pass for officers to wrongly detain

4    persons despite lacking any jurisdiction. In *Puliafico v. Cnty. of San Bernardino*, the court found

5    that an officer's de facto arrest was unconstitutional where the officer lacked probable cause and

6    statutory authority to detain or arrest the plaintiff. *Puliafico v. Cnty. of San Bernardino*, 42 F. Supp.

7    2d 1000, 1012–13 (C.D. Cal. 1999) ("Where officers lacked a lawful basis for the initial stop and

8    continued detention, the arrest was invalid under the Fourth Amendment."). Similarly, in *Ortega-*

9    *Melendres v. Arpaio*, officers who initiated stops under the guise of enforcing immigration

10   violations without actual enforcement authority were found to have violated the Fourth Amendment,

11   even when they claimed reasonable suspicion. *Ortega-Melendres v. Arpaio,* 836 F. Supp. 2d 959,

12   979–80 (D. Ariz. 2011) ("Actual knowledge that a person is unlawfully present is not sufficient to

13   form reasonable suspicion that they have violated a criminal statute.").

14           Defendants next invoke the "exigent circumstances" exception to the warrant requirement.

15   However, that doctrine is extremely limited, applicable only when officers face an imminent threat

16   to life, risk of serious injury, or imminent destruction of evidence. *See United States v. McConney*,

17   728 F.2d 1195, 1200 (9th Cir. 1984), overruled on other grounds by *Estate of Merchant v. Inyo*

18   *Cnty.*, 993 F.3d 741 (9th Cir. 2021). A routine traffic infraction, such as speeding or following too

19   closely during rush hour, does not meet that threshold. Indeed, if seeing a purported traffic infraction

20   by itself could constitute an "exigent circumstance" in the manner the City urges, it would render

21   all territorial jurisdiction limitations meaningless.

22           Defendants also suggest that Myers' arrest was justified based on probable cause stemming

23   from field sobriety testing. But the FAC alleges only that he was subjected to a field sobriety test—

24   not that he failed it. *See FAC* ¶ 30. At this stage, the Court must credit Plaintiff's version of events.

25   *See Iqbal*, 556 U.S. 662, 678. Conclusory characterizations of impairment are insufficient to defeat

26   a well-pled claim based on unlawful seizure by unauthorized actors. The question is not whether

27   another law enforcement agency, with proper authority, could have conducted the stop and arrest

28   under these facts. The question is whether the City marshals—whose power is limited by state

1  statute—had any legal authority to initiate a stop outside their jurisdiction. The answer is no. *See*

2  *Nev. Rev. Stat.* § 280.125(3)(b); *Las Vegas, Nev., Mun. Code* § 2.28.080(B).

3      Plaintiff's claims are not premised on a mere technical violation of Nevada law; instead they

4  are based on the absence of lawful enforcement authority. This is a fundamental Fourth Amendment

5  defect. Accordingly, Defendants' motion to dismiss the Fourth Amendment claim must be denied.

6  The FAC plausibly alleges that the arrest was conducted by officers lacking territorial jurisdictional

7  authority under state law, rendering the seizure/arrest constitutionally unreasonable.

8            **C.  Myers' Fourteenth Amendment Claim should not be dismissed.**

9      Defendants next argue that Plaintiff's Fourteenth Amendment claim must be dismissed,

10  citing *Graham v. Connor* for the proposition that all unlawful arrest and detention claims must be

11  brought solely under the Fourth Amendment. *Graham v. Connor*, 490 U.S. 386 (1989). However,

12  claims of wrongful arrest or excessive force against state actors are necessarily brought under the

13  Fourteenth Amendment, because it is the Fourteenth Amendment which incorporates the Fourth

14  Amendment's protections and applies them to state actors. *See Mapp v. Ohio*, 367 U.S. 643, 655

15  (1961) ("[T]he Fourth Amendment's right of privacy has been declared enforceable against the

16  States through the Due Process Clause of the Fourteenth Amendment."). Thus, as a technical matter,

17  all § 1983 claims for unlawful arrest by state law enforcement officers are grounded in the

18  Fourteenth Amendment because it is that amendment which incorporates the Fourth Amendment.

19      Moreover, Plaintiff has separately and specifically pleaded substantive and procedural due

20  process violations arising under the Fourteenth Amendment. *See First Am. Compl.* ¶ 46. These

21  claims are not duplicative of Plaintiff's Fourth Amendment claim, nor are they based on the degree

22  of force used. Instead, they arise from the fact that Las Vegas City Marshals—who lacked any

23  statutory authority to operate outside of City-owned property—arrested Plaintiff well outside their

24  territorial jurisdiction in direct violation of *Nev. Rev. Stat.* § 280.125(3)(b) and *Las Vegas, Nev.,*

25  *Mun. Code* § 2.28.080(B). This conduct supports a due process claim because it reflects an arrest

26  made not merely unlawfully, but by an official with no power to act in that geographic area.

27      As the United States District Court for Arizona observed in a factually analogous case, the

28  Fourth and Fourteenth Amendments can work in tandem where a plaintiff alleges both an unlawful

1  seizure and that such seizures were based on policies or practices of unauthorized law enforcement

2  action. *Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959 (Dist. Ariz. 2011) (putative civil rights

3  class action alleging Fourth and Fourteenth Amendment violations based on racial profiling in

4  immigration stops by police). The due process component addresses the deprivation of liberty by

5  government agents who, like the City marshals here, act beyond the scope of their delegated power,

6  potentially without any constitutional justification at all.

7        In this case, Plaintiff alleges that the City of Las Vegas knowingly allowed its marshals to

8  perform arrests outside their limited territorial authority, and that this policy caused a deprivation of

9  liberty without any lawful basis. Plaintiff's allegations concern a lack of lawful authority to arrest

10  altogether, not simply the manner in which a lawful arrest was executed. Such allegations implicate

11  both procedural and substantive due process rights. *See Puliafico*, 42 F. Supp. 2d 1000, 1012–13

12  (sustaining due process and Fourth Amendment claims where officers detained an individual

13  without probable cause or jurisdictional authority). Accordingly, the Court should decline to dismiss

14  Plaintiff's Fourteenth Amendment claim, especially at this early stage of the proceedings.

15        **D.  Plaintiff Plausibly Alleges a *Monell* Claim Against the City.**

16        A municipality may be held liable under 42 U.S.C. § 1983 when a plaintiff's constitutional

17  rights are violated as a result of the government's official policy, longstanding custom, failure to

18  train or supervise, or ratification by a final policymaker. *See Monell v. Dep't of Soc. Servs. of N.Y.*,

19  436 U.S. 658, 690–91 (1978). A municipal policy may be shown through formal policy, a

20  longstanding practice or custom that constitutes the standard operating procedure of the entity, a

21  final policymaker's decision or ratification, or inadequate training or supervision that amounts to

22  deliberate indifference. *See Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005); *Christie*

23  *v. Iopa*, 176 F.3d 1231, 1235–39 (9th Cir. 1999); *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).

24  To survive a motion to dismiss, a plaintiff needs only to allege facts that plausibly suggest such a

25  policy or custom exists and was the moving force behind the violation. *Starr v. Baca*, 652 F.3d 1202,

26  1216 (9th Cir. 2011).

27        **1.  Plaintiff Alleges a Widespread and Persistent Custom, Practice or
          Policy of Extraterritorial Enforcement.**

28

1    Defendants argue that Plaintiff's *Monell* claim should be dismissed because he has not

2    identified a longstanding practice or custom and instead relies on a single incident. This is incorrect.

3    Plaintiff has alleged specific facts demonstrating that the City of Las Vegas Department of Public

4    Safety has a de facto policy and custom of allowing City marshals to conduct traffic enforcement

5    actions outside the limited territorial jurisdiction defined by state law. *See Nev. Rev. Stat.* §

6    280.125(3)(b); *Las Vegas, Nev., Mun. Code* § 2.28.080(B). The FAC does not rest solely on

7    Plaintiff's stop on January 9, 2025—it alleges a "policy, practice, and/or custom" of extra-

8    jurisdictional enforcement affecting over 1,000 individuals, carried out by marshals who regularly

9    operate on federal and state highways without legal authority. *See* FAC ¶¶ 3, 16–24, 77. This is

10   precisely the type of "persistent and widespread practice" that the Ninth Circuit has found actionable

11   under *Monell*. *See Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (custom must be of sufficient

12   "duration, frequency, and consistency" to become policy).

13   Plaintiff's allegations also go beyond bare conclusions. He identifies multiple officers,

14   references specific statutes and ordinances limiting marshal authority, and quotes the City's own

15   admissions from prior litigation where the City acknowledged its marshals were limited to city-

16   owned property. *See* FAC ¶¶ 21–24. These well-pleaded factual allegations plausibly support the

17   inference of a widespread custom under *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. 662, 678; *Twombly*,

18   550 U.S. 544, 555.

19   This case is distinguishable from *Ramirez v. Las Vegas Metro. Police Dep't*, 22 F. App'x

20   828 (9th Cir. 2001), and *Guarino v. Las Vegas Metro. Police Dep't*, No. 2:13-cv-02135-GMN-NJK,

21   2014 WL 12791070, at *4 (D. Nev. July 21, 2014), where plaintiffs relied only on a single incident.

22   In the present case, Plaintiff alleges that extraterritorial jurisdictional enforcement by marshals is an

23   ongoing and officially condoned practice going as high as the Chief Marshal, Defendant Potts, not

24   merely a one-time aberration by officers. Moreover, as the Ninth Circuit emphasized in *Gordon v.

25   County of Orange*, 6 F.4th 961 (9th Cir. 2021), plaintiffs may establish a custom even in the absence

26   of written policy if they allege facts showing that unconstitutional practices were "so widespread as

27   to have the force of law." *Id.* at 973–74. The FAC clearly meets that standard.

28   Plaintiff's allegations, taken as true, show more than an isolated incident. They plausibly

10

1    allege a systemic pattern of unconstitutional behavior carried out by City marshals, facilitated by

2    the City's Department of Public Safety, and condoned by Chief Potts. That is more than sufficient

3    to proceed past the pleading stage. *See Christie*, 176 F.3d at 1235–36 (ratification of subordinate

4    conduct by a policymaker supports *Monell* liability); *Timmons v. Zolman*, No. 2:17-cv-00360-

5    MMD-NJK, 2019 WL 13250977, at *2 (D. Nev. Apr. 9, 2019) (denying dismissal where plaintiff

6    plausibly alleged municipal customs related to legal mail violations). The FAC exposes the City's

7    deliberate policy of allowing marshals to flout jurisdictional limits, a practice the City knows

8    violates state law but persists unto the detriment of thousands.

9                            **2.  Plaintiff Has Plausibly Alleged *Monell* Liability Through
10                                 Ratification by Chief Potts.**

11            In addition to a "policy, practice or custom" theory under *Monell*, Plaintiff has also pleaded

12    a ratification *Monell* theory as well. Ordinarily, ratification is a question for the jury. *See Fuller v.*

13    *City of Oakland*, 47 F.3d 1522, 1534 (9th Cir. 1995). To establish *Monell* liability through

14    ratification, a plaintiff must allege that an official with final policymaking authority "ratified a

15    subordinate's unconstitutional decision or action and the basis for it." *Lytle v. Carl*, 382 F.3d 978,

16    987 (9th Cir. 2004). The ratification must reflect a "conscious, affirmative choice" to approve the

17    unlawful conduct. *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010),

18    overruled on other grounds by *Castro v. Cnty. of L.A.*, 833 F.3d 1060 (9th Cir. 2016). Plaintiff has

19    met this burden by alleging that Chief Potts and the Department of Public Safety authorized and

20    permitted enforcement by marshals on highways not under City control.

21            Defendants argue that Plaintiff's *Monell* claim under a ratification theory must be dismissed

22    because the FAC does not allege that Chief Jason Potts had final policymaking authority or that he

23    expressly approved the marshals' conduct. This argument is both legally and factually meritless.

24    The FAC alleges that Chief Potts, as head of the Department of Public Safety, "endorsed, ratified,

25    or even mandated or encouraged" the practice of Las Vegas City marshals conducting law

26    enforcement operations outside their territorial jurisdiction. *FAC* ¶ 81. This is not a boilerplate

27    conclusion—it is a specific factual allegation grounded in statutory context, official City admissions,

28    and a pattern of misconduct. Defendants' assertion that Plaintiff fails to allege Potts' policymaking

1  authority is nonsense. *See* Mot. at 12–13. As the chief of the very agency overseeing the marshals,

2  Potts is plainly positioned as the final decisionmaker regarding marshal enforcement activity. At

3  this stage, Plaintiff need only plead plausibility—not prove the claim. *Baca*, 652 F.3d 1202, 1216.

4  The FAC delivers.

5          The City's attempt to shield Potts while ignoring its own admissions of limited jurisdiction

6  is an attempt to dodge accountability for a policy it has long exploited. The marshals' unlawful

7  actions are not random or unauthorized; they reflect a coordinated practice condoned and

8  encouraged by the City and Chief Potts himself. Plaintiff's allegations make clear that this is not

9  about isolated misconduct—it is about a rogue operation with top-down endorsement and approval.

10 *See Christie*, 176 F.3d 1231, 1239 ("To show ratification, a plaintiff must prove that the authorized

11 policymakers approve a subordinate's decision and the basis for it.").

12         Further, as the court recently reaffirmed in *Wells v. City of Las Vegas*, summary judgment

13 is inappropriate where the record supports an inference that a policymaker made a "deliberate

14 choice" to permit unlawful enforcement. *See Wells v. City of Las Vegas*, No. 2:21-CV-1346-JCM

15 (EJY), 2024 WL 2028007, at *14–15 (D. Nev. May 7, 2024). At the pleading stage, the bar is even

16 lower. Plaintiff is not required to present documentation of a written directive; it is enough to allege

17 that a final policymaker knew of and permitted the conduct. That is precisely what Plaintiff has

18 done. Accordingly, Plaintiff has alleged facts that, if true, would establish that Chief Potts ratified

19 the unlawful stop and the broader policy of marshals acting outside of their legal authority. That is

20 sufficient to survive dismissal.

### 3.  Plaintiff Has Sufficiently Alleged Deliberate Indifference and Causation Under *Monell*.

23         Defendants argue that Plaintiff fails to allege that the City's policies or customs amount to

24 deliberate indifference or were the moving force behind the constitutional violations alleged.

25 However, this is not a case of conclusory pleading or speculation. The First Amended Complaint

26 ("FAC") alleges a well-established municipal failure to train and supervise marshals regarding the

27 jurisdictional limits clearly imposed by *Nev. Rev. Stat.* § 280.125(3)(b) and *Las Vegas, Nev., Mun.*

28 *Code* § 2.28.080(B). *See* FAC ¶¶ 3, 16–24, 77–85. These allegations more than meet the

1    requirements to survive a motion to dismiss.

2        A municipality is liable under § 1983 where its failure to train or supervise its employees

3    amounts to deliberate indifference to the rights of persons with whom those employees come into

4    contact. *Harris*, 489 U.S. 378, 388. "Deliberate indifference" is a stringent standard of fault

5    requiring proof that a municipal actor disregarded a known or obvious consequence of their action.

6    *Connick v. Thompson*, 563 U.S. 51, 61 (2011). Yet, courts routinely find this standard met where,

7    as here, a municipality has notice of ongoing constitutional violations and refuses to correct them.

8        The FAC alleges that the City of Las Vegas was on clear notice—via statutory language, its

9    own litigation admissions, and internal policies—that marshals lack jurisdiction outside city-

10   controlled property, and yet the City continued to allow and encourage those officers to detain

11   individuals on state and federal highways. *See* FAC ¶¶ 21–24, 84–85. The City's failure to train or

12   supervise its marshals to respect these limits, in defiance of clear legislative boundaries, constitutes

13   a policy of deliberate indifference. As the FAC makes clear, "the City's persistence in this practice,

14   knowing it cannot override NRS § 280.125(3)(b), meets the 'stringent' deliberate indifference

15   standard." *Connick*, 563 U.S. at 61.

16       Defendants suggest that Plaintiff merely recites *Monell* elements. That claim is a desperate

17   deflection from the City's own reckless disregard for the law. Plaintiff alleges specific factual

18   circumstances linking the City's policy and training failures to constitutional harm. The FAC also

19   satisfies the "moving force" requirement. It alleges that the City's policy of permitting marshals to

20   act outside of jurisdiction "was the moving force behind Plaintiff's and the class's injuries," directly

21   causing their unconstitutional detentions. *See* FAC ¶ 80. This allegation is not speculative—it

22   logically and directly flows from the admitted policy and the specific arrest of Plaintiff.

23       Defendants' attempt to analogize this case to the unpublished decision in *Ramirez v. Las

24   Vegas Metro. Police Dep't*, 22 Fed. Appx. 828 (9th Cir. 2001) (unpublished) also fails. Unlike the

25   single-instance claims in *Ramirez*, Plaintiff here pleads a broader policy and widespread misconduct

26   believed to affect more than 1,000 individuals. Plaintiff's FAC is the antithesis of a single-instance

27   *Monell* claim. Nor is this a case like *Miller v. Nye Cnty.*, 488 F. Supp. 3d 973 (D. Nev. 2020), where

28   the plaintiff failed to allege either pattern or predictability. In contrast, this case has both: a history

1    of extraterritorial enforcement and clear legal standards prohibiting that conduct. Accordingly, the

2    FAC contains detailed allegations demonstrating that the City knew of jurisdictional limits,

3    continued to allow marshals to violate them, failed to train or supervise those officers, and caused

4    the constitutional injuries suffered by Plaintiff and the class. That is deliberate indifference. That is

5    causation. And that is sufficient under *Monell*.

6                    **E. Myers' Claims against Chief Potts should not be Dismissed.**

7            Defendants' attempt to dismiss claims against Chief Potts as redundant or unsupported is a

8    misguided attempt to shield a key architect of the City's lawless policy. *See* Mot. at 14–16. Indeed,

9    Chief Potts was added as a named Defendant in this case when, after the original complaint was

10   filed and garnered news media attention, a whistleblower former marshal came forward and

11   explained that Potts was personally aware of this legal issue but continued to authorize and

12   encourage this enforcement. The law is clear: supervisors or final policy makers can be held liable

13   under § 1983 not only for their own direct actions, but for their ratification of unconstitutional

14   policies and their failure to act in the face of known violations.

15                            **1.  Potts' Culpability Is Clear.**

16           The FAC plainly alleges that Potts, as Chief of the Department of Public Safety, oversaw,

17   endorsed, and encouraged a policy whereby City marshals routinely enforced laws outside their

18   statutory jurisdiction in violation of *Nev. Rev. Stat.* § 280.125(3)(b). *See* FAC ¶¶ 26, 81. The City's

19   marshals, under Potts' command, conducted stops, searches, and arrests on state and federal

20   highways—far beyond any property owned or controlled by the City. As the Ninth Circuit has

21   repeatedly made clear, supervisors are liable for (1) their own culpable action in the training,

22   supervision, or control of subordinates; (2) their acquiescence in the constitutional deprivation; or

23   (3) conduct that shows a reckless or callous indifference to the rights of others. *Edgerly*, 599 F.3d

24   946, 961; *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). That is precisely what Plaintiff alleges

25   here: Potts knew of the marshals' repeated violations of territorial limits and failed to intervene. He

26   oversaw the very department responsible, ratified the practice, and made no attempt to curtail it. *See*

27   FAC ¶¶ 26, 84–85.

28           This case is distinguishable from the case cited by the Defendants, *Chuman v. Wright* 76

                                                      14

F.3d 292 (9th Cir. 1996), where the plaintiff failed to tie supervisory liability to any particular conduct. Here, the FAC ties Potts' supervisory authority directly to a clearly articulated and unlawful policy. Unlike *Chuman*, Plaintiff does not allege group liability—he alleges personal culpability. As the Ninth Circuit reaffirmed in *Larez v. City of Los Angeles*, supervisors may be liable under § 1983 when they promulgate unconstitutional policies or fail to act upon knowledge of repeated violations. *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991). In *Larez*, the police chief was held personally liable because he knowingly permitted unconstitutional conduct through lack of training and ratification of subordinates' actions. *Id.* at 646. The same rationale applies here: Potts knowingly permitted his marshals to enforce laws outside their jurisdiction, in defiance of the very statutes limiting their authority.

### 2. Claims Against Potts Are Not Redundant.

Second, Defendants argue that because Plaintiff has named both the City and Chief Potts, the claims against Potts should be dismissed as redundant. However, this argument reflects a misapplication of the rule stated in *Center for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff's Dep't*, 533 F.3d 780, 799 (9th Cir. 2008). That case stands for the uncontroversial principle that "[a]n official capacity suit against a municipal officer is equivalent to a suit against the entity," and thus, when both the municipality and the official are named in an official capacity only, the official may be dismissed as a redundant defendant. *Id.* However, Potts is <u>not</u> sued only in his official capacity in this case. Instead, Plaintiff expressly alleges that Potts is sued in his *individual* capacity for his own actions and supervisory failures. *See* FAC ¶¶ 9, 43. Courts have consistently held that individual-capacity claims are distinct from *Monell* claims and not subject to dismissal as duplicative. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) (individual capacity suits seek to impose personal liability and are not equivalent to suits against the entity); *Larez*, 946 F.2d at 646 (holding that an individual capacity claim against the police chief was not redundant of *Monell* liability).

Defendants' claim of redundancy thus incorrectly states the pleadings and the controlling law. Unlike in *Ward v. City of Sparks*, No. 3:09-CV-0007-RCJ-VPC, 2011 WL 587153, at *4 (D. Nev. Jan. 12, 2011), where the official was sued only in his official capacity, Potts is sued for his

1  personal role in the unlawful pattern of enforcement that led to Plaintiff's wrongful arrest. The City's

2  attempt to conflate the individual and *Monell* claims while ignoring Potts' role in perpetuating its

3  lawless custom is a dodge that this Court should reject. Where a supervisor acts with deliberate

4  indifference to known constitutional violations and ratifies the offending conduct, § 1983 liability

5  follows.

6  **F.   The Defendant Officers are not Shielded by Qualified Immunity.**

7  Defendants next argue that the City Marshals are entitled to qualified immunity because

8  Plaintiff's rights were not clearly established and that the officers reasonably believed their conduct

9  was lawful. Qualified immunity protects government officials "from liability for civil damages

10  insofar as their conduct does not violate clearly established statutory or constitutional rights of which

11  a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It "is an

12  immunity from suit rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526

13  (1985). As the Ninth Circuit has emphasized, the court must address qualified immunity "as a legal

14  issue before trial whenever possible." *Morales v. Fry*, 873 F.3d 817, 823 (9th Cir. 2017). Officers

15  may be denied qualified immunity at the motion to dismiss stage where the complaint plausibly

16  alleges that: (1) the officers violated a constitutional right, and (2) the right was clearly established

17  at the time. *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017). While

18  plaintiffs bear the burden on the second prong, that burden is satisfied where the law was

19  "sufficiently clear that every reasonable official would understand that what he is doing is unlawful."

20  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018); *Romero v. Kitsap Cnty.*, 931 F.2d 624, 627

21  (9th Cir. 1991). While there need not be a factually identical case creating such notice, plaintiffs

22  must point to "existing precedent" that puts "the statutory or constitutional questions beyond

23  debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152, 200 L. Ed. 2d 449 (2018).

24  Here, the FAC alleges that marshals stopped and arrested Plaintiff on I-11/US Route 95,

25  despite lacking statutory authority to operate on property not owned, leased, or otherwise controlled

26  by the City of Las Vegas. That prohibition is clearly set forth in *Nev. Rev. Stat.* § 280.125(3)(b). The

27  language is direct, unambiguous, and restrictive: marshals may enforce state and local laws only on

28  City-controlled property. Plaintiff has alleged that these jurisdictional restrictions were known and

ignored by the Defendant officers. *See* FAC ¶¶ 16–24, 27–30. There is no plausible ambiguity here. The statute is clear. As the Ninth Circuit has stated, legislative history is only necessary when a statute's meaning is unclear. *Heppner v. Alyeska Pipeline Serv. Co.*, 665 F.2d 868, 871 (9th Cir. 1981). But here, no such ambiguity exists. That Plaintiff includes legislative history, see FAC at ¶ 23-24) does not render the statute debatable—it reinforces the point that the City's continued defiance of this restriction was deliberate.

Qualified immunity cannot shield officers who act outside the bounds of lawful authority. Defendants rely on *Virginia v. Moore,* 553 U.S. 164 (2008) to argue that violations of state arrest rules do not create Fourth Amendment violations. However, this is not a correct statement of *Moore*. *Moore* only ruled that the Fourth Amendment does not *automatically* incorporate all state procedural laws regarding arrests, ergo a violation of state law in an arrest in not per se, in all cases, also a violation of the Fourth Amendment. *Moore* did not involve an extraterritorial arrest at all. Instead, in *Moore* the officers had jurisdiction under state law to make arrests and simply failed to follow procedural requirements regarding summonses. Here, by contrast, Plaintiff alleges that the officers lacked any jurisdictional authority to enforce the law where the stop occurred. The conduct alleged was not a procedural irregularity; it was an unauthorized act by officers acting entirely outside the scope of their territorial jurisdiction. That distinction matters.

For Fourth Amendment purposes, extraterritorial arrests violate the Fourth Amendment. *Ross v. Neff*, 905 F.2d 1349, 1353-1354 (10th Cir. 1990) ("We have implied that an arrest made outside of the arresting officer's jurisdiction violates the Fourth Amendment to the Constitution and is therefore actionable pursuant to 42 U.S.C. § 1983 under the appropriate circumstances…We now so hold expressly."). *See United States v. Henderson*, 906 F.3d 1109, 1117 (9th Cir. 2018) (magistrate judge's issuance of warrant to be executed outside the geographic bounds of the judge's district violated the Fourth Amendment). This is because the Fourth Amendment's "reasonableness" requirement is determined under the common law at the time of the adoption of the Fourth Amendment. The common law of the founding era deemed searches and seizures unreasonable when police officers acted outside the bounds of their jurisdiction. When the Fourth Amendment was adopted, the common law drew clear distinctions based on whether an officer was acting within

1    or outside the scope of his authority. When attempting to execute a warrant, for example, an officer

2    could execute the warrant only "so far as the jurisdiction of the magistrate and himself extends."

3    *Henderson*, 906 F.3d at 1116 (quoting 4 William Blackstone, Commentaries). Furthermore, "[a]t

4    common law, an officer [could not] arrest a person outside of his precinct, even though the offense

5    was committed within it." 2 David S. Garland & Licius P. McGehee, The American and English

6    Encyclopaedia of Law 863 (2d ed. 1896). While the Fourth Amendment does not incorporate all

7    state arrest and jurisdiction laws, it does protect against extraterritorial arrests by law enforcement.

8    This is not a close call. The territorial limitations on the City Marshals were clearly

9    established. No reasonable officer could read *Nev. Rev. Stat.* § 280.125(3)(b)—limiting authority to

10   "real property owned, leased or otherwise under the control" of the City—and conclude they had

11   power to arrest on a federal interstate. Qualified immunity protects reasonable mistakes, not lawless

12   enforcement. Because the FAC plausibly alleges that this conduct violated clearly established

13   Fourth Amendment protections, the motion to dismiss based on qualified immunity must be denied.

14              **G.  Myers has Pleaded a Plausible Battery and False Imprisonment Claim.**

15   Defendants next argue that Plaintiff's state law tort claims for battery and false imprisonment

16   should be dismissed on the basis that the officers' conduct was lawful and justified under both

17   Nevada and federal law. However, Plaintiff's allegations, accepted as true at this stage, plausibly

18   support that the Defendant officers acted without lawful authority when they detained and arrested

19   him outside their statutorily defined jurisdiction. Both battery and false imprisonment require a

20   showing that the officer's conduct was not legally justified. Plaintiff has met this standard by

21   alleging the marshals exceeded their legal jurisdiction under *Nev. Rev. Stat.* § 280.125(3)(b), which

22   plainly limits their enforcement authority to City-controlled property. Accordingly, the motion to

23   dismiss these claims must be denied.

24              **1.  Plaintiff Has Stated a Plausible Claim for Battery and False**
25                   **Imprisonment Against the Defendant Officers.**

26   Defendants contend that the battery and false imprisonment claims fail because the officers

27   acted lawfully. But this presumes the very issue in dispute: whether the Defendant officers had any

28   legal authority to stop and arrest Plaintiff on I-11/US Route 95. The FAC alleges that the marshals

18

were acting well outside their jurisdiction as defined by *Nev. Rev. Stat.* § 280.125(3)(b), which restricts enforcement powers to property "owned, leased or otherwise under the control" of the City. That statutory limitation is neither ambiguous nor qualified—and it forecloses any claim of lawful authority by the officers at the time of the incident. *See Humboldt Gen. Hosp. v. Sixth Jud. Dist. Ct.*, 132 Nev. 544, 549, 376 P.3d 167, 172 (2016) ("Battery is an intentional and offensive touching of a person who has not consented to the touching.").

Peace officers are privileged to use force only when it is reasonably necessary to carry out a lawful detention or arrest. *Yada v. Simpson*, 112 Nev. 254, 913 P.2d 1261, 1262 (1996) (superseded by statute on other grounds) ("a police officer who uses more force than is reasonably necessary to effect a lawful arrest commits a battery"). In *Plank v. Las Vegas Metro. Police Dep't,* 2016 U.S. Dist. LEXIS 32438, *27, 2016 WL 1048892, the court found issues of fact prevented summary judgment as to battery claims despite dismissal of a *Monell* action.

Any force used to make this arrest was, by definition, excessive because the marshals had no legal authority to stop Meyers at all. Here, the FAC alleges that the marshals stopped and arrested Plaintiff without any legal basis to do so, since they were not on property under City control. *See* FAC ¶¶ 18, 27–30, 87. The statute governing their authority was clear, and the City itself had acknowledged its marshals' jurisdictional limits in prior litigation. When an officer detains and uses force on a citizen outside the scope of any legal authority, that conduct is neither privileged nor lawful. Accordingly, Plaintiff has plausibly alleged that any physical contact during that stop constituted battery.

Similarly, false imprisonment under *Nev. Rev. Stat.* § 200.460(1) is "an unlawful violation of the personal liberty of another," and is established by confinement "without sufficient legal authority." *Yada*, 913 P.2d at 1262. Again, this hinges on whether the officers were acting with lawful authority when they initiated the detention. The FAC pleads that they were not—and that their lack of jurisdiction rendered the stop and arrest illegal. Because the marshals acted outside the bounds of their statutory authority, Plaintiff's liberty was restrained without legal justification, which satisfies the elements of false imprisonment.

Defendants' reliance on federal Fourth Amendment standards to justify dismissal of these

1    claims is misplaced. In *Ramirez v. City of Reno*, 925 F. Supp. 681, 691 (D. Nev. 1996), the court

2    made clear that "the standard for common-law assault and battery by a police officer...mirrors the

3    federal civil rights law standard," but that does not mean a federal Fourth Amendment analysis

4    controls the outcome of a state law tort claim—especially where the arrest itself is alleged to be

5    jurisdictionally void. Furthermore, as previously discussed, the holding in *Virginia v. Moore*, does

6    not immunize officers from liability under state tort law. In *Moore*, the officers performed a

7    custodial arrest despite the fact that under Virginia state law, they should have simply issued a ticket

8    or citation and summons. *Moore* did not concern an extraterritorial arrest at all. The Supreme Court

9    held that an arrest made in violation of state procedural rules did not violate the Fourth Amendment

10   where the officer had general statutory authority to arrest. *Id.* However, that holding is inapplicable

11   here, where Plaintiff alleges that the Defendant officers had no jurisdiction at all—not just that they

12   exercised poor discretion. The distinction is legally significant. Whether the officers' conduct was

13   ultimately justified is a question of fact and law to be addressed at summary judgment—not a basis

14   for dismissal at the pleading stage.

15 / 16
### 2.   Plaintiff Has Plausibly Alleged Chief Potts's Liability for Battery and False Imprisonment.

17        Defendants also argue that Chief Potts should be dismissed from Plaintiff's battery and false

18   imprisonment claims on the grounds that he did not personally participate in the arrest or detention

19   and that the claims against him are redundant of those against the City. This argument misstates the

20   applicable standard for supervisory liability and fails to account for the FAC's allegations of Chief

21   Potts' direct role in ratifying, encouraging, and maintaining the unlawful policy that led to the

22   violations at issue. Supervisors can be held liable for tortious conduct if they directly participate in,

23   authorize, ratify, or otherwise causally contribute to the alleged wrongful conduct. This is consistent

24   with the rule that supervisory liability under 42 USC § 1983 is appropriate where a policymaker is

25   not merely a passive figurehead, but actively sets or allows a policy that results in constitutional or

26   statutory violations. *See Taylor*, 880 F.2d 1040, 1045. That principle applies equally to state law tort

27   claims arising from the same facts. The Nevada Supreme Court has not insulated municipal

28   supervisors from state tort liability where their own conduct—such as deliberate failure to supervise

1    or approve of unlawful policing policies—directly causes a violation of rights.

2        Admittedly, the FAC does in part seek to impose respondeat superior or vicarious liability

3    on Potts for state law claims. However, the FAC does not rely solely on respondeat superior to hold

4    Potts liable. Rather, it alleges that Chief Potts, in his role as Chief of the Department of Public

5    Safety, ratified, permitted, and in fact encouraged a policy of marshals performing traffic

6    enforcement outside the jurisdictional boundaries set by *Nev. Rev. Stat.* § 280.125(3)(b). *See* FAC

7    ¶¶ 26, 81, 90, 102. This policy directly caused Plaintiff's unlawful detention and arrest, which

8    underlies both his battery and false imprisonment claims. The law does not require that Chief Potts

9    be physically present during the arrest; it only requires that he played a causal role in enabling the

10    unlawful conduct.

11        Indeed, Plaintiff's theory of liability is that Chief Potts oversaw and maintained a systemic

12    practice that was known to violate statutory law. That is more than sufficient to state a plausible

13    claim. As the Ninth Circuit explained in *Center for Bio-Ethical Reform*, an official-capacity

14    defendant may be dismissed as redundant only where the plaintiff seeks damages for the entity's

15    liability alone, and no independent basis for personal or supervisory liability exists. *Center for Bio-*

16    *Ethical Reform*, 533 F.3d 780, 799 (9th Cir. 2008). Here, Plaintiff specifically sues Potts in his

17    individual capacity for his own conduct in permitting the illegal policy, as confirmed in FAC ¶ 9.

18        Moreover, the argument that Potts' liability is "redundant" is inapplicable where, as here,

19    Plaintiff brings claims against the City for *Monell* liability and against Potts for personal

20    involvement in the creation or enforcement of the policy. See *Larez*, 946 F.2d 630, 646 (rejecting

21    redundancy argument where police chief was sued in both individual and official capacity for his

22    own actions in approving unlawful conduct). Likewise, *Graham*, 473 U.S. 159, 165–66, confirms

23    that individual and official capacity claims are legally distinct, and that individual liability flows

24    from personal participation. The FAC states a plausible claim for battery and false imprisonment

25    against Chief Potts based on his personal role in establishing and perpetuating the unlawful policy.

26    The Court should deny Defendants' motion to dismiss Chief Potts from these claims.

27        **3.    Plaintiff Has Plausibly Pleaded Battery and False Imprisonment**
         **Claims Against the City.**

28

1    Defendants argue that Plaintiff's battery and false imprisonment claims against the City of

2  Las Vegas must be dismissed because the officers' conduct was not committed within the scope of

3  their employment and was not reasonably foreseeable. However, under both common law principles

4  and Nevada's statutory codification at *Nev. Rev. Stat.* § 41.745, Plaintiff's claims against the City

5  are plausibly alleged and should proceed.[1] The Nevada Supreme Court has long held that an

6  employer may be held liable for intentional torts committed by its employees where those torts occur

7  within the course and scope of the employee's assigned duties. *Prell Hotel Corp. v. Antonacci*, 86

8  Nev. 390, 391, 469 P.2d 399, 400 (1970) ("[W]here the willful tort is committed in the course of

9  the very task assigned to the employee, liability may be extended to the employer"). The relevant

10 inquiry is not whether the conduct was malicious or excessive, but whether the employee was

11 performing the type of work the employer directed at the time of the alleged tort. Here, the FAC

12 alleges that the City marshals were actively engaged in conducting a traffic stop and arrest—core

13 law enforcement functions—when they allegedly violated Plaintiff's rights. *See* FAC ¶¶ 27–30, 91,

14 96.

15    Moreover, *NRS* § 41.745 does not alter this rule; it refines it. Under the statute, the City may

16 be held liable where the employee's conduct (1) was not a truly independent venture, (2) was

17 committed in the course of the very task assigned to the employee, and (3) was reasonably

18 foreseeable. See *Wood v. Safeway, Inc.*, 121 Nev. 724, 738, 121 P.3d 1026, 1036 (2005) ("Whether

19 an act is reasonably foreseeable depends on whether a person of ordinary intelligence and prudence

20 could have reasonably anticipated the conduct and probability of injury").

21    Here, all three prongs are met. First, the marshals were not acting on a personal frolic but

22 rather engaged in law enforcement duties on behalf of the City. Second, traffic enforcement is

23 indisputably one of the "very tasks" marshals are assigned to perform. Third, the violation alleged—

24 overstepping geographic enforcement boundaries defined by statute—was plainly foreseeable to the

25 City and on information and belief was actually known and encouraged by Potts. The City's own

---

27 [1] For federal 42 USC § 1983 claims, a municipality is not vicariously liable. However, the state of

28 Nevada lacks such a rule for state law claims.

admissions and prior litigation confirm that its marshals were knowingly permitted to act outside their jurisdiction, despite *NRS* § 280.125(3)(b)'s clear limitations. *See* FAC ¶¶ 21–24. This pattern of misconduct, ratified by City leadership, makes it not only foreseeable, but systemic.

Defendants also argue that Plaintiff alleges only that the City is vicariously liable because it employed the marshals. But that argument ignores that Plaintiff has specifically alleged that the City was aware of, permitted, and failed to correct the ongoing practice of City marshals conducting traffic enforcement outside of their jurisdiction. Accordingly, the statutory and common law standards are satisfied, and the City's liability is properly pleaded. The Court should therefore deny Defendants' motion to dismiss the state law claims against the City.

### 4. Discretionary Function Immunity Does Not Shield Defendants from Liability for Battery and False Imprisonment.

Defendants also argue that Plaintiff Myers' battery and false imprisonment claims are barred by discretionary function immunity under *Nev. Rev. Stat.* § 41.032. This argument should also be rejected.

When discussing discretionary immunity in the context of Constitutional actions, immediately the question the District Court should ask itself is "do the Defendants seriously maintain that they have discretion when performing their jobs to violate the Nevada or United States Constitution?" In other words, do state actors have discretion to violate the Constitution? For example, imagine a police officer without a warrant breaks down your door in the middle of the night and shoots you without provocation as he attempts to arrest you for jaywalking the previous day. Would such Constitutional violations be entitled to discretionary-function immunity merely because the officer testifies later "that's just how I chose to do my job that day in my discretion." The answer to that legal discretionary immunity question is, of course, a resounding "no!" Such carte blanche license would seem like a monumentally bad idea and by itself would be unconstitutional as a statute may not override a Constitutional protection. *E.g., Xi v. Haugen*, 68 F.4th 824, 839 (3d Cir. 2023) ("because government officials never have discretion to violate the Constitution, unconstitutional government conduct is per se outside the discretionary function exception."). However, the Defendants present a misguided application of the discretionary-

1  function immunity under state law regardless, so the District Court need not even rest their

2  Opposition on that point alone.

3        Nevada has adopted the federal *Berkovitz/Gaubert* test to determine what acts of a state actor

4  qualify for discretionary-function immunity. *Martinez v. Maruszczak*, 123 Nev. 433, 435-36, 168

5  P.3d 720, 722 (2007) ("we adopt the two-part federal test, as articulated in *Berkovitz v. United States*

6  and *United States v. Gaubert* for determining when the discretionary-function exception to the

7  general waiver of governmental immunity applies"). This really isn't admitting to much of

8  consequence because there are legions of cases attesting to how difficult and, at times, unpredictable

9  that legal standard is to apply. However, it should be noted that the *state actor* asserting the

10  immunity "has the burden of proving that the discretionary function exception applies," not the

11  Plaintiffs. *Sigman v. United States*, 217 F.3d 785, 793 (9th Cir. 2000). **"In a close case, [the court]**

12  **must favor a waiver of immunity and accommodate the legislative scheme [generally waiving**

13  **immunity]."** *Hagblom v. State Director of Motor Vehicles*, 93 Nev. 599, 571 P.2d 1172, 1174-75

14  (Nev. 1977) (*quoting State v. Silva*, 86 Nev. 911, 478 P.2d 591, 593 (Nev. 1970)); *see also Martinez*,

15  168 P.3d at 724 ("Because the primary legislative intent behind the qualified waiver of sovereign

16  immunity from tort liability under NRS Chapter 41 was to waive immunity, we strictly construe

17  limitations upon that waiver." (quotation marks and footnote citation omitted)). Further, **"decisions**

18  **made in bad faith, such as 'abusive' conduct resulting from 'hostility' or 'willful or deliberate**

19  **disregard' for a citizen's rights, aren't protected under the immunity statute even if they arise**

20  **out of a discretionary function."** *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1133

21  (9th Cir. 2017) *citing Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007). Lastly,

22  conduct in violation of the Constitution cannot qualify for discretionary-function immunity because

23  following the Constitution (or any law) is not discretionary but rather mandatory. *Martinez v. United*

24  *States*, 997 F.3d 867, 877 (9th Cir. 2021) ("[e]ven if the agents' actions involved elements of

25  discretion, agents do not have discretion to violate the Constitution.").

26        Admittedly, the scope of discretionary-function immunity is difficult to grasp and not all

27  reasonable lawyers and judges agree on its scope. Yet, the present case is an easy one to determine

28  that discretionary-function immunity does <u>not</u> apply to the Defendants. Broadly speaking, the

1    purpose of discretionary-function immunity is to provide immunity for "decisions [that] require

2    analysis of government *policy* concerns." For the immunity to apply, the suit must be "be based on

3    considerations of social, economic, or political policy." *Martinez,* 168 P.3d at 724. In other words,

4    if the City was faced with budgetary decisions which led it to lay off several marshals or stop

5    patrolling city parks to divert resources to the city buildings, such decisions are simply an exercise

6    of policy and the discretionary-function immunity applies. However, performing one's job as a

7    peace officer in a manner which is unlawful and unconstitutional is <u>not</u> the type of broad policy-

8    making decision the discretionary function immunity was meant to protect. Again by way of

9    example, the Nevada Supreme Court has found that although a state employed physician exercises

10   medical judgment when treating a patient, these individual medical decisions are not the kind of

11   broad, general, policy-making decisions that would provide the physician with discretionary-

12   function immunity if the physician is sued for malpractice as to a particular patient. *Id.* Examples of

13   acts that do qualify for discretionary-function immunity include, a sheriff's decision to assign a

14   certain number of deputies to a location or a policymaker's decision to create a county-run hospital,

15   in other words broad governmental policy decisions.

16           Equally clear under Nevada law is that "certain acts, although discretionary, do not fall

17   within the ambit of discretionary-act immunity 'because they involve negligence unrelated to any

18   plausible policy objectives.'" *Butler v. Bayer*, 123 Nev. 450, 466, 168 P.3d 1055, 1066 (2007). The

19   Ninth Circuit has repeatedly held that routine law enforcement activities—including arrests,

20   detentions, and traffic stops—are not the kind of policy-based decisions protected under

21   discretionary immunity. *Sandoval v. Las Vegas Metro. Police Dep't*, 756 F.3d 1154, 1168–69 (9th

22   Cir. 2014) (discretionary immunity did not apply where officers' conduct showed deliberate

23   disregard for constitutional rights); *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 924

24   (9th Cir. 2024) (affirming discretionary immunity where no bad faith was alleged, but reaffirming

25   that immunity does not attach to constitutional violations). Moreover, it is clear that a peace officer's

26   decision may start as one entitled to discretionary-function immunity and then cross over into an act

27   for which he or she is <u>not</u> entitled to immunity. For example, imagine an officer decides to stop a

28   vehicle for speeding 12 mph over the posted limit due to a general policy that any vehicle speeding

1    more than 10 mph should be pulled over.  That initial decision to pull the car over may well be

2    protected by discretionary-function immunity, i.e., a general government policy to pull over vehicles

3    once they exceed the speed limit by 10 mph. However, then imagine that the *manner* by which the

4    officer chooses to pull that vehicle over is by shooting out its tires and performing a pit maneuver

5    such that the vehicle rolls over and injures the occupants. In that case, clearly the *manner* or method

6    which the officer chose to perform that traffic stop is <u>not</u> subject to discretionary-function immunity.

7    For example, in *Butler v. Bayer*, the Nevada Supreme Court held that although a decision to parole

8    a mentally handicapped prisoner in the first place would be a policy-making decision to which

9    discretionary-function immunity applies, the *manner* in which the handicapped prisoner was

10   released did not qualify for discretionary function immunity. *Id*. In that case, a mentally handicapped

11   inmate had been released from custody in a manner that endangered him and the Nevada Supreme

12   Court found that the *manner* in which the inmate was released (as opposed to the decision to release

13   him itself) was not protected by discretionary-function immunity.

14        This difference between what does and what does not qualify for discretionary-function

15   immunity can be subtle. However, one needn't look too far into the Nevada Supreme Court's

16   application of *Martinez* to determine that law enforcement is <u>not</u> generally immunized under the

17   discretionary-function immunity for the manner in which they perform their duties. In *Estate of*

18   *Brenes v. Las Vegas Metro. Police Dep't*, 468 P.3d 368 (Nev. 2020) (unpublished), a deceased

19   person's estate sued LVMPD and its officer after the officer shot and killed a suspect he claimed

20   was assaulting him. LVMPD and the officer were then sued for federal and state excessive force

21   Constitutional claims. The District Court dismissed the claims based on discretionary-function

22   immunity. The Nevada Supreme Court reversed and held that while acts entitled to this

23   discretionary-function immunity must involve "an element of individual judgment or choice," they

24   also must be acts which are based on "based on considerations of social, economic, or political

25   policy." *Id*. The Nevada Supreme Court held that the officer's spur of the moment decision to use

26   (allegedly) unlawful force on a given suspect is not the kind of policy-related decision entitled to

27   discretionary-function immunity. *Id*., *citing Garcia v. United States*, 826 F.2d 806, 809 (9th Cir.

28   1987) ("While law enforcement involves exercise of a certain amount of discretion on the part of

1    individual officers, such decisions do not involve the sort of generalized social, economic and

2    political policy choices that Congress intended to exempt from tort liability."). *Davis v. City of Las*

3    *Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007) ("[W]here an officer's actions are attributable to bad

4    faith, immunity does not apply whether an act is discretionary or not."). At least one other case from

5    this District has recognized that routine decisions made by peace officers as to how to conduct

6    arrests or searches are <u>not</u> protected by discretionary function immunity. *Castaneda v. Planeta*, No.

7    03:05-CV-0283-LRH-RAM, 2007 U.S. Dist. LEXIS 84328, at *10 (D. Nev. Oct. 30, 2007)

8    ("Defendant [officer] Shields' decision to strike Plaintiff's face was not based on considerations of

9    social, economic, or political policy.")

10          If peace officers or county officials could escape liability for violations of the Constitution

11   by simply stating "well, I just used by discretion to enter and search that person's apartment with an

12   expired eviction order that day" we would be creating an exception to the Constitution that would

13   swallow the purpose of Constitutional protections. The Ninth Circuit has repeatedly held that

14   government officials accused of *Constitutional* violations cannot hide behind discretionary function

15   immunity because "[e]ven if the agents' actions involved elements of discretion, agents do not have

16   discretion to violate the Constitution." *Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021)

17   (rejecting claims of discretionary-function immunity under the *Berkovitz/Gaubert* framework);

18   *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) ("In general, governmental conduct cannot be

19   discretionary if it violates a legal mandate…"). Therefore, discretionary function immunity is really

20   only applicable to negligence-type cases and not alleged Constitutional violations. The Third Circuit

21   recently said it best in *Xiaoxing Xi v. Haugen*, 68 F.4th 824, 829 (3d Cir. 2023), when it held "[w]e

22   clarify today, however, that the 'clearly established' threshold is inapplicable to the discretionary

23   function analysis, and because the Government has no discretion to violate the Constitution, FTCA

24   claims premised on conduct that is plausibly alleged to violate the Constitution may not be dismissed

25   on the basis of the discretionary function exception.").

26          In summary, the pleaded acts of the Defendants in this case do not invoke discretionary

27   function immunity. Therefore, the Defendants' Motion to Dismiss the claims against them on

28   ground of discretionary-function immunity should be denied.

1
2

**H. Plaintiff's Request for Punitive Damages Against the City Should Be Denied Only to the Extent Required by Law, Not Dismissed in Its Entirety.**

3

4     Defendants argue that Plaintiff's request for punitive damages against the City must be

5 dismissed because municipalities are categorically immune from punitive damages under both

6 federal and Nevada law. While the City is correct that punitive damages are not recoverable against

7 a municipality under 42 U.S.C. § 1983 or, as to state law claims, under NRS § 41.035(1),

8 Defendants' motion should be denied insofar as it seeks blanket dismissal without acknowledging

9 that the request may remain valid against individual Defendants sued in their personal capacities.

10     In this case, although Plaintiff has requested punitive damages in the Prayer for Relief and

11 included general references to the City in doing so, these requests should be interpreted as directed

12 primarily at the individual Defendants to the extent permitted by law. The FAC alleges that the

13 Defendant officers acted knowingly and without lawful authority when they seized, arrested, and

14 searched Plaintiff outside their territorial jurisdiction. *See* FAC ¶¶ 27–30, 81, 87, 96. To the extent

15 that Defendants seek dismissal of punitive damages solely against the City for *Monell* and state law

16 tort liability, Plaintiff does not object. However, the motion should be denied to the extent that it

17 seeks to strike punitive damages globally, as such relief remains appropriate and legally viable

against individual Defendants sued in their personal capacities.

18

**I. The Viability of Plaintiff's Class Allegations is Not Contingent Upon the Ultimate Success of His Individual Claims at the Pleading Stage.**

19

20     Defendants urge this Court to dismiss Plaintiff's class allegations on the speculative basis

21 that if the Court were to dismiss Plaintiff Myers' individual claims, then the putative class claims

22 must also fall for lack of standing. However, FRCP 23 does not require that class claims be

23 dismissed simply because a named plaintiff's claims are challenged pre-certification. The Ninth

24 Circuit has made clear that class allegations should only be dismissed at the pleading stage if it is

25 apparent from the face of the complaint that the proposed class cannot be maintained under any set

26 of circumstances—a showing the Defendants have not made. *Pitts v. Terrible Herbst, Inc.*, 653 F.3d

1081, 1091–92 (9th Cir. 2011).

27

28     Even if the Court were inclined to grant dismissal of some or all of Plaintiff's individual

28

1    claims, that would not automatically preclude class certification or moot the case. Courts have

2    repeatedly emphasized that class claims may survive even if the named plaintiff's individual claims

3    fail, so long as certification has not yet been resolved and the claims are capable of repetition. As

4    the Ninth Circuit held in *Pitts*, a class action does not become moot when a named plaintiff's

5    individual claim is resolved before a motion for class certification is filed, because the "relation-

6    back" doctrine may apply, and because early resolution of individual claims does not eliminate the

7    potential controversy for similarly situated individuals. See *Pitts*, 653 F.3d at 1091–92 (rejecting

8    attempt to moot class claims through a Rule 68 offer to the named plaintiff and emphasizing the risk

9    of undermining the class action device). Decisions have also held that even where a named

10   plaintiff's individual claims are no longer viable, class allegations may persist where certification

11   has not been addressed and other potential representatives remain. See *United States Parole*

12   *Comm'n v. Geraghty*, 445 U.S. 388, 404 (1980); *Sosna v. Iowa*, 419 U.S. 393, 402 (1975); *Deposit*

13   *Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980). These cases underscore the importance of

14   allowing the Rule 23 process to unfold fully—through discovery, briefing, and evidentiary

15   consideration—before any court may conclude that class allegations are legally deficient.

16   　　　　Moreover, Defendants mischaracterize the Ninth Circuit's decision in *Lierboe v. State Farm*

17   *Mut. Auto. Ins. Co.*, 350 F.3d 1018 (9th Cir. 2003), which held that where a named plaintiff had no

18   standing from the outset of litigation, the case must be dismissed without further proceedings. That

19   situation is wholly inapplicable here. Unlike in *Lierboe*, where the plaintiff never had a viable claim

20   under Montana law and therefore could not have suffered any injury, Plaintiff Myers has alleged

21   actionable constitutional violations and injuries under 42 U.S.C. § 1983 as well as Nevada law. His

22   individual claims—whether ultimately successful or not—are not facially invalid, and the operative

23   complaint contains extensive factual allegations that state plausible claims. Accordingly, *Lierboe*

24   does not support pre-certification dismissal here.

25   　　　　Dismissal of class allegations at the pleading stage is strongly disfavored. Class allegations

26   are generally not tested at the pleadings stage and instead are usually tested after one party has filed

27   a motion for class certification. *E.g., Thorpe v. Abbott Labs., Inc.*, 534 F. Supp. 2d 1120, 1125 (N.D.

28   Cal. 2008); *In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 505 F. Supp. 2d 609, 615 (N.D. Cal.

2007). That standard is not met here. Instead, courts in the Ninth Circuit repeatedly recognize that class certification is better decided through a motion under Rule 23 rather than at the pleading stage. See *Williams v. Boeing Co.*, 517 F.3d 1120, 1137 (9th Cir. 2008) (preserving class action jurisdiction despite resolution of some individual claims). Accordingly, Defendants' motion to dismiss the class allegations on the assumption that Myers' individual claims may fail is premature and legally unsound. The Court should deny the motion and allow the class claims to proceed through discovery and the Rule 23 process in the normal course.

### III.   CONCLUSION.

For the reasons set forth above, Plaintiff Derek Myers has plausibly alleged that the Defendant officers acted outside the scope of their lawful authority under Nevada law and the United States Constitution, and that these violations were carried out under the City's longstanding, systemic, and ratified policies. Myers has pleaded viable claims for relief under the Fourth and Fourteenth Amendments, *Monell*, state tort law, and class action principles. The FAC, when viewed in the light most favorable to Plaintiff, satisfies the pleading standards of Rule 12(b)(6) and presents a compelling basis for discovery. Accordingly, the Court should deny Defendants' Motion to Dismiss in its entirety.

DATED this 6th day of June, 2025.

**BREEDEN & ASSOCIATES, PLLC**

*/s/ Adam J. Breeden*

**ADAM J. BREEDEN, ESQ.**
Nevada Bar No. 008768
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 6th day of June, 2025, I served a copy of the foregoing legal document **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** via the method indicated below:

| X | Through the Court's ECF/CM system on all registered users |
|---|---|
|   | Pursuant to FRCP 5, by placing a copy in the US mail, postage pre-paid to the following counsel of record or parties in proper person:<br><br>NECHOLE GARCIA, ESQ.<br>PAUL MATA, ESQ<br>495 S. Main Street, Sixth Floor<br>Las Vegas, NV 89101<br>*Attorneys for Defendants* |
|   | Via receipt of copy (proof of service to follow) |

An Attorney or Employee of the following firm:

*/s/ Kirsten Brown*

**BREEDEN & ASSOCIATES, PLLC**